AO 242 (Rev. 09/17) Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED
AUG 17 2026
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ______ DEPUTY

David Antonio Aviles Perez
[redacted]

*Petitioner*

v.

Todd Blanche, U.S. General attorney, Markwayne Mullin, Secretary of DHS, Todd Lyons, Director of ICE, Christopher Larose, Warden of Otay Mesa Detention Center.

*Respondent*
*(name of warden or authorized person having custody of petitioner)*

Case No. '26CV4706 JO DEB
*(Supplied by Clerk of Court)*

## PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2241

### Personal Information

1. (a) Your full name: David Antonio Aviles Perez
   (b) Other names you have used: ______
2. Place of confinement:
   (a) Name of institution: Otay Mesa Detention Center
   (b) Address: Otay Mesa Detention Center P.O. Box 439049
   San Diego C.A. 92143
   (c) Your identification number: [redacted]
3. Are you currently being held on orders by:
   ☑ Federal authorities ☐ State authorities ☐ Other - explain:
4. Are you currently:
   ☐ A pretrial detainee (waiting for trial on criminal charges)
   ☐ Serving a sentence (incarceration, parole, probation, etc.) after having been convicted of a crime
   If you are currently serving a sentence, provide:
   (a) Name and location of court that sentenced you: ______
   (b) Docket number of criminal case: ______
   (c) Date of sentencing: ______
   ☑ Being held on an immigration charge
   ☐ Other *(explain)*: ______

### Decision or Action You Are Challenging

5. What are you challenging in this petition:
   ☐ How your sentence is being carried out, calculated, or credited by prison or parole authorities (for example, revocation or calculation of good time credits)

☐ Pretrial detention
☑ Immigration detention
☐ Detainer
☐ The validity of your conviction or sentence as imposed (for example, sentence beyond the statutory maximum or improperly calculated under the sentencing guidelines)
☐ Disciplinary proceedings
☐ Other *(explain)*:

6. Provide more information about the decision or action you are challenging:

(a) Name and location of the agency or court: Otay Mesa Detention Center

(b) Docket number, case number, or opinion number: [redacted]

(c) Decision or action you are challenging *(for disciplinary proceedings, specify the penalties imposed)*:

(d) Date of the decision or action:

### Your Earlier Challenges of the Decision or Action

7. **First appeal**

Did you appeal the decision, file a grievance, or seek an administrative remedy?

☐ Yes ☑ No

(a) If "Yes," provide:

(1) Name of the authority, agency, or court:

(2) Date of filing:

(3) Docket number, case number, or opinion number:

(4) Result:

(5) Date of result:

(6) Issues raised:

(b) If you answered "No," explain why you did not appeal: I cannot present constitutional violation on my Due process and rights complaints to the Immigration Judge or the BIA. These administrative entities do do not have jurisdiction to heard and/or decide them.

8. **Second appeal**

After the first appeal, did you file a second appeal to a higher authority, agency, or court?

☐ Yes ☑ No

(a) If "Yes," provide:

(1) Name of the authority, agency, or court: ______

(2) Date of filing: ______

(3) Docket number, case number, or opinion number: ______

(4) Result: ______

(5) Date of result: ______

(6) Issues raised: ______

(b) If you answered "No," explain why you did not file a second appeal: same reasons as in 7 (b)

9. **Third appeal**

After the second appeal, did you file a third appeal to a higher authority, agency, or court?

☐ Yes ☑ No

(a) If "Yes," provide:

(1) Name of the authority, agency, or court: ______

(2) Date of filing: ______

(3) Docket number, case number, or opinion number: ______

(4) Result: ______

(5) Date of result: ______

(6) Issues raised: ______

(b) If you answered "No," explain why you did not file a third appeal: same reasons as in 7 (b)

10. **Motion under 28 U.S.C. § 2255**

In this petition, are you challenging the validity of your conviction or sentence as imposed?

☐ Yes ☐ No

If "Yes," answer the following:

(a) Have you already filed a motion under 28 U.S.C. § 2255 that challenged this conviction or sentence?

☐ Yes ☑ No

If "Yes," provide:

(1) Name of court: ______

(2) Case number: ______

(3) Date of filing: ______

(4) Result: ______

(5) Date of result: ______

(6) Issues raised: ______

(b) Have you ever filed a motion in a United States Court of Appeals under 28 U.S.C. § 2244(b)(3)(A), seeking permission to file a second or successive Section 2255 motion to challenge this conviction or sentence?

❒ Yes ☑ No

If "Yes," provide:

(1) Name of court: ______

(2) Case number: ______

(3) Date of filing: ______

(4) Result: ______

(5) Date of result: ______

(6) Issues raised: ______

(c) Explain why the remedy under 28 U.S.C. § 2255 is inadequate or ineffective to challenge your conviction or sentence: ______

11. **Appeals of immigration proceedings**

Does this case concern immigration proceedings?

☑ Yes ❒ No

If "Yes," provide:

(a) Date you were taken into immigration custody: March 26, 2026.

(b) Date of the removal or reinstatement order: ______

(c) Did you file an appeal with the Board of Immigration Appeals?

❒ Yes ☑ No

If "Yes," provide:
(1) Date of filing: ______
(2) Case number: ______
(3) Result: ______
(4) Date of result: ______
(5) Issues raised: ______

(d) Did you appeal the decision to the United States Court of Appeals?
☐ Yes ☑ No
If "Yes," provide:
(1) Name of court: ______
(2) Date of filing: ______
(3) Case number: ______
(4) Result: ______
(5) Date of result: ______
(6) Issues raised: ______

12. **Other appeals**

Other than the appeals you listed above, have you filed any other petition, application, or motion about the issues raised in this petition?
☐ Yes ☑ No
If "Yes," provide:
(a) Kind of petition, motion, or application: ______
(b) Name of the authority, agency, or court: ______
(c) Date of filing: ______
(d) Docket number, case number, or opinion number: ______
(e) Result: ______
(f) Date of result: ______
(g) Issues raised: ______

## Grounds for Your Challenge in This Petition

13. State every ground (reason) that supports your claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** I am being unlawfully detained in violation of the fourth amendment of the U.S. constitutional see attached.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

(b) Did you present Ground One in all appeals that were available to you?

☐ Yes ☑ No

**GROUND TWO:** I am being unlawfully detained in violation of the fifth amendment of the U.S. constitutional see attached.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

(b) Did you present Ground Two in all appeals that were available to you?

☐ Yes ☑ No

**GROUND THREE:** I am being unlawfully detained in violation of the APA- administrative procedure act. see attached.

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

(b) Did you present Ground Three in all appeals that were available to you?

☐ Yes ☑ No

**GROUND FOUR**: ______

(a) Supporting facts *(Be brief. Do not cite cases or law.)*:

(b) Did you present Ground Four in all appeals that were available to you?

☐ Yes ☑ No

14. If there are any grounds that you did not present in all appeals that were available to you, explain why you did not: ______

**Request for Relief**

15. State exactly what you want the court to do: Order Petitioner's Immediate release from respondent's custody.

**Declaration Under Penalty Of Perjury**

If you are incarcerated, on what date did you place this petition in the prison mail system:
8-10-2026

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct. I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date: 8-10-2026

*Signature of Petitioner*

*Signature of Attorney or other authorized person, if any*

David Antonio Aviles Perez
A#[redacted]
Otay Mesa Detention Center
P.O. Box 439049
San Diego, California 92143

DETAINED

UNITED STATES DISTRIC COURT
SOUTHERN DISTRIC OF CALIFORNIA
SAN DIEGO, CALIFORNIA

FILED
AUG 17 2026
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY [signature] DEPUTY

David Antonio Aviles Perez,
A#[redacted]

PETITIONER,

V.

Patrick Diver, San Diego Field Office Director, Enforcement and Removal Operations, United States Immigration and Customs Enforcement (ICE);

Christopher J. Larose, Senior Warden Otay Mesa Detention Center;

Markwayne Mullin, Secretary, United States Department of Homeland Security;

Todd Blanche, Attorney General of the United States; Executive Office for Immigration Review (EOIR);

Donald J. Trump, President of the United States;

RESPONDENTS.

Case No: '26CV4706 JO DEB

PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241;

**PETITIONER'S MEMORANDUM OF LAW, POINTS AND AUTHORITIES IN SUPPORT FOR THE GRANTING OF WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

## INTRODUCTION

1. Mr. David Antonio Aviles Perez, ("Petitioner") petitions this Court for a writ of habeas corpus to remedy Petitioner's unlawful, unreasonable and unconstitutional detention by Respondents. Mr. Aviles Perez submits this Memorandum of Law in Support of the Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241 for this Court to enter an Order mandating his immediate release from immigration detention.

2. Petitioner has been unlawfully detained in the custody of Immigration and Customs Enforcement at the Otay Mesa Detention Center, San Diego, California, since March 26, 2026, when he was unlawfully sized, arrested, assaulted and beaten by 5 men camouflaged and disguised pretending to be construction or city workers. Mr. Aviles Perez spend ten days in the medical ward of Otay Mesa Detention Center due to the injuries inflicted by these 5 unidentified men.

3. Petitioner respectfully request that the Court use its authority under 28 U.S.C § 2243 to order the Respondents to file a return within three days, unless they can show good cause for additional time. *See* 28 U.S.C. § 2243 (stating that an order to show cause why a petition for a writ of habeas corpus should be denied is returnable "within three days unless for good cause additional time, not exceeding twenty days, is allowed").

4. In order to permit full judicial review of the claims herein and requested relief, Petitioner respectfully request that the Court order Respondents not to transfer Petitioner outside the jurisdiction of this Court pending consideration of this Petition.

## JURISDICTION AND VENUE

5. Jurisdiction arises under 28 U.S.C. §§ 2241 and 1331.

6. The Court may grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 and 28 U.S.C. § 1651.

7. Venue is proper in the Southern District of California because Petitioner is being detain in Otay Mesa Detention Center located in San Diego, California.

## PARTIES

8. Petitioner, Mr. David Antonio Aviles Perez (A# [redacted], is a 35-year-old native and citizen El Salvador who is currently unlawfully detained at the Otay Mesa Detention Center in San Diego, California.

9. Respondent Patrick Divver is the Field Office Director for ICE Enforcement and Removal Operations (ERO) in San Diego, California. He is Petitioner's immediate custodian, responsible for his detention at Otay Mesa Detention Center and the person with the authorize his detention or

release. Respondent Patrick Divver is sue in his official capacity.

10. Respondent Christopher J. Larose Senior Warden of the Otay Mesa Detention Center oversees the day-to-day functioning of the facility, and has immediate physical custody of Petitioner pursuant to a contract with ICE to detain noncitizens. Respondent Warden is sued in his official capacity as the Warden of a federal detention facility.

11. Respondent Markwayne Mullin is the Secretary of the Department of Homeland Security. As a Secretary, he oversees the federal agency responsible for implementing and enforcing the INA, including the detention and arrest of noncitizens. He is sued in his official capacity.

12. Respondent Department of Homeland Security (DHS) is the federal agency responsible for implementing and enforcing the INA, including the detention and arrest of noncitizens.

13. Respondent Todd Blanche is the Attorney General of the United States and head of the U.S. Department of Justice. In that capacity, he oversees Executive Office for Immigration Review (EOIR) and the immigration court system the agency administers. He is ultimately responsible for the agency's operation. He is sued in his official capacity.

14. The Otay Mesa Immigration Court is the adjudicatory body within EOIR with jurisdiction over the removal and bond cases of all individuals detained at te Otay Mesa Detention Center.

15. Donald J. Trump is the President of the United States and is the Boss of all the other Respondents. He is sue in his official capacity.

## STATEMENT OF FACTS

16. Petitioner was born in la Union, El Salvador.

17. Petitioner entered the United States on December 29, 2013, the first 10 years he lived at [redacted] In June 2023 he move to [redacted] and lived there until he bought his own motor home in March, 2026 were he was living in a parking lot call old town and has continuously lived in San Diego, California, United States.

18. On March 26, 2026, Mr. Aviles Perez was getting ready to go to work as he always does on a regular Thursdays mornings, when a group of 5 unidentified men knocked at his door disguised as and pretending to be construction or city workers wearing white hard hats and oranges vest asking Petitioner to move his motor home because they needed to do some work in the area he was parked, in order to make him come out of his home they told him he had a flat tired, when he went to check the tire is when these 5 men believed to Mr. Aviles Perez to be construction or city workers jump on him, assaulted and started beating him trying to seize and arrest him without identifying themselves nor these men were wearing anything to identify them as federal agents or any type of law enforcement officers. Petitioner was scare for his life as he didn't know who were this people attacking him and beating him, all he thought about at that moment was fight for his life.

19. Petitioner is currently unlawfully detained at the Otay Mesa Detention Center in San Diego,

California.

20. Petitioner fears returning to his home country El Salvador and has applied for asylum, withholding of removal, and protection under the Convention Against Torture before an Immigration Judge.

21. Petitioner is currently pending and Mr. Aviles Perez is scheduled to appear in Immigration Court for an individual merits hearing on August 26, 2026.

**PETITIONER'S MEMORANDUM OF LAW, POINTS AND AUTHORITIES IN SUPPORT FOR THE GRANTING OF WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**

Antiseptic judicial rhetoric cannot do justice to what is happening. Across the interior of the United States, agents of the federal government, anonymous-armed with military weapons, operating from unmarked vehicles, acting without warrants of any kind-are seizing persons for civil immigration violations and imprisoning them without any semblance of due process. The systematic character of this practice and its deliberate elimination of every structural feature that distinguishes constitutional authority from raw force place it beyond the reach of ordinary legal description. It is an assault on the constitutional order. It is what the Fourth Amendment was written to prevent. It is what the Due Process Clause of the Fifth Amendment forbids.

The Due Process Clause prohibits deprivations of life, liberty, and property without due process of law. U.S. Const. amend. V. The Supreme Court has firmly established that "the Due Process Clause applies to all persons within the United States, including [noncitizens], whether their presence is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis,* 533 U.S. 678, 679, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001); *see also Trump v. J.G.G.*, 604 U.S. 670, 673, 145 S. Ct. 1003, 221 L. Ed. 2d 529 (2025) ("It is well established that the Fifth Amendment entitles [noncitizens] to due process of law in the context of removal proceedings." (citation omitted)). "Freedom from imprisonment - from government custody, detention, or other forms of physical restraint - lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690.

This Petition for Writ of Habeas Corpus filed by Petitioner, Mr. David Antonio Aviles Perez, brings just that circumstance before this court as a discrete case and controversy. This court should decide it as such. But this Court should not pretend, through careful procedural language, that what is at issue here is a technical question of statutory interpretation. The overarching issue is whether the federal government may deploy anonymous agents to seize persons on American streets and highways for civil violations, without warrants, without identification, and without any process before or after. The Constitution does not permit that. Mr. Aviles Perez brings forward and explains the reasons why.

In a constitutional republic, as the United States of America its believe it to be, governmental force derives its authority from the Constitution. But that authority is not unlimited. The Government's power is legitimate only because it is derived from the People and exercised through law by identifiable public officers answerable to the public and to the courts. The structure of the Constitution guarantees visibility. Both the officer and the force he employs are traceable to authority delegated by the People and subject to the limits imposed by law. When the Government

uses force against the public, the citizen can recognize the officer as a lawful representative. The public can evaluate the act. The judiciary can later review it. Every stop, arrest, detention, and use of force can be tested against the Constitution's protections. Not so here.

For these reasons and the reasons that follow, Mr. Aviles Perez Verified Petition for Writ of Habeas Corpus ("Petition"), should be GRANTED. The court should DECLARE that both Mr. Aviles Perez Fourth Amendment right to be free from unreasonable searches and seizures as well as his Fifth Amendment right to due process have been violated. Immediate release is the only relief sufficient to remedy Mr. Aviles Perez unlawful detention.

This Court should decline to allow Respondents to transform an unlawful detention into a lawful one through alternative, retrospective, *post hoc* justification presented mid-litigation, as doing so would give the Government a free pass to violate a person's statutory and constitutional rights first and search for authority later. The Constitution does not permit the United States Government to target people on the streets, [or in their motor homes legally parked] arrest them without serving any papers, deny them meaningful due process, and detain them for arbitrary or indefinite periods of time while they engage in phishing expeditions to justify the arrests. *see also Urquilla-Ramos v. Trump,* F. Supp. 3d , No. 2:26-cv-00066, 2026 U.S. Dist. LEXIS 34096, 2026 WL 475069, at *17 (S.D.W. Va. Feb. 19, 2026) ("Due process is not satisfied by the existence of legal authority somewhere in the United States Code. It is satisfied only through constitutionally adequate procedure."); *Lopez Benitez v. Francis,* 795 F. Supp. 3d 475, 486 (S.D.N.Y. 2025) (releasing petitioner and explaining that the court "cannot credit [r]espondents' new position as to the basis for . . . detention, which was adopted post hoc and raised for the first time in this litigation."); *Arias Gudino v. Lowe,* 785 F. Supp. 3d 27, 46 n.8 (M.D. Pa. 2025) (releasing petitioner and discussing the impropriety of allowing the government to proceed on "post hoc justifications for detention").

## BACKGROUND

Please refer to Mr. Aviles Perez Sworn Declaration attached herein as Attachment "A".

## LEGAL STANDARD

"[H]abeas corpus is a broad, independent writ designed to address challenges to any illegal custody," *Wall v. Kiser,* 21 F.4th 266, 273 (4th Cir. 2021), including those "by executive direction," *Preiser v. Rodriguez,* 411 U.S. 475, 484, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973). The "heart of habeas corpus" is the challenge to a petitioner's confinement (or the duration of his confinement), where he seeks "immediate release or a speedier release from that confinement." *Preiser,* 411 U.S. at 498. The Constitution guarantees that the writ of habeas corpus is "available to every individual

detained within the United States." *Hamdi v. Rumsfeld,* 542 U.S. 507, 525, 124 S. Ct. 2633, 159 L. Ed. 2d 578 (2004). Accordingly, noncitizens may invoke habeas in immigration-related matters where no other statutory mechanism for review is provided. *See Zadvydas v. Davis,* 533 U.S. 678, 687-88, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001). Indeed, challenges to present immigration confinement "fall within the 'core' of the writ of habeas corpus." *Trump v. J. G. G.*, 604 U.S. 670, 672, 145 S. Ct. 1003, 221 L. Ed. 2d 529 (2025) (*quoting Nance v. Ward,* 597 U.S. 159, 167, 142 S. Ct. 2214, 213 L. Ed. 2d 499 (2022))

28 U.S.C. § 2241 confers on federal district courts "within their respective jurisdictions" the authority to hear applications for habeas corpus by any person who claims to be held "in custody in violation of the Constitution or laws or treaties of the United States . . . ." *Id.* §§ 2241(a), (c). After receiving the petition and any response thereto, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243. The petitioner bears the burden of proving that he is being held contrary to law by a preponderance of the evidence. *Walker v. Johnston*, 312 U.S. 275, 286, 61 S. Ct. 574, 85 L. Ed. 830 (1941) ("On a hearing, [the § 2241 petitioner has] the burden of sustaining his allegations by a preponderance of evidence."); *Parke v. Raley,* 506 U.S. 20, 31, 113 S. Ct. 517, 121 L. Ed. 2d 391 (1992); *Sumner v. Mata*, 449 U.S. 539, 551, 101 S. Ct. 764, 66 L. Ed. 2d 722 (1981).

"The touchstone of the Fourth Amendment is reasonableness . . . ." *United States v. Knights*, 534 U.S. 112, 118, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001). This is "generally assessed by carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *County of Los Angeles v. Mendez,* 581 U.S. 420, 427, 137 S. Ct. 1539, 198 L. Ed. 2d 52 (2017) (*quoting Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985)). Overall, reasonableness is an objective inquiry that "is evaluated by looking at the 'totality of the circumstances.'" *Case v. Montana,* 607 U.S. , 146 S. Ct. 500, 508, 223 L. Ed. 2d 382 (2026) (first *quoting Barnes v. Felix,* 605 U.S. 73, 80, 145 S. Ct. 1353, 221 L. Ed. 2d 751 (2025); and then *quoting Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996)).

The Fifth Amendment guarantees a different constitutional protection: due process. The Fifth Amendment states that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. V. "Freedom from imprisonment ㅋ from government custody, detention, or other forms of physical restraint ㅋ lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. The Supreme Court has emphasized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas,* 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). Further, "once an alien enters the country, the legal circumstance changes, for the Due Process

Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693.

Although Congress's power over immigration policy has been described as "plenary," see *Kleindienst v. Mandel*, 408 U.S. 753, 769, 92 S. Ct. 2576, 33 L. Ed. 2d 683 (1972), "it is well-established that the Due Process Clause stands as a significant constraint on the manner in which the political branches may exercise their plenary authority." *Hernandez v. Sessions*, 872 F.3d 976, 990 n.17 (9th Cir. 2017) (citing Zadvydas v. Davis, 533 U.S. 678, 695, 121 S. Ct. 2491, 150 L. Ed. 2d 653 (2001)).

## DISCUSSION

Mr. Aviles Perez complains that his rights under both the Fourth and Fifth Amendments have been violated. Petitioner was arrested by unidentifiable, officers acting without a warrant, without articulable justification for concealing their identities, and with no mechanism by which he could identify those seizing him or meaningfully test the legality of their asserted authority. In the absence of a warrant, individualized justification, or any means of contemporaneous attribution of the seizure to particular officers, the deployment of anonymous agents to execute a civil arrest strips the seizure of the accountability the Fourth Amendment presupposes and renders it unreasonable.

## JURISDICTION

As a threshold matter, This court should conclude the court has jurisdiction over the Petition. This court has jurisdiction under 28 U.S.C. § 2241, the Suspension Clause, U.S. Const. art. I § 9, cl. 2, and 28 U.S.C. § 1331, as Petitioner is presently in custody under color of the authority of the United States, and Petitioner's custody is in violation of the Constitution, laws, or treaties of the United States. This Court may grant relief under 28 U.S.C. § 2241 (habeas corpus), 5 U.S.C. § 702 (establishing the right of review for a person suffering a legal wrong due to agency action), and 28 U.S.C. § 1651 (All Writs Act). Here, Petitioner is not challenging an order of removal or a removability determination. Petitioner is instead challenging the manner of his seizure and separately his continued detention. Petitioner does not contest the commencement, adjudication, or execution of removal proceedings, but instead Mr. Aviles Perez challenges the lawfulness of his continued detention and the manner in which he was seized.

## THE FOURTH AMENDMENT

After determining this court has jurisdiction over the Petition, this Court should now turn to the lawfulness of Petitioner's arrest under the Fourth Amendment. A challenge to one's confinement necessarily implicates the legality of the process that led to the individual's detention. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Under the Fourth Amendment, the initial seizure of a person-even to effectuate detention under immigration law-must be reasonable.

Petitioner was peacefully at his motor home getting ready to go work, when this group of men dressed as a construction or city workers knocked at his door. He was held at gun point by men wearing only civilian clothes with hard hats and oranges vest pretending to be city workers. He was violently and with the threat of deadly force ordered to stay on the ground and handcuffed by individuals without any explanation. He was taken into custody by, unknown federal agents, leaving Mr. Aviles Perez unable to identify those seizing Petitioner. Based on the above, and Mr. Aviles Perez declaration, this Court should conclude that the use of unidentified agents, pretending to be something that they are not, driving unmarked vehicles to effect a civil immigration detention under these circumstances is unreasonable and unconstitutional. As a result, this Court should find that Petitioner's Fourth Amendment rights were unquestionably violated.

Mr. Aviles Perez request this Court to consider the Court's responsibility to interpret the Constitution, the philosophical foundation of our system of self-governance, the historical context of immigration enforcement, the historical context of the Fourth Amendment, the personal security the Amendment guarantees, the meaning of a "reasonable" search and seizure, and the Government's interests in the use of unidentified agents, pretending to be something that they are not, driving unmarked vehicles to effect a civil immigration detention. Mr. Aviles Perez presents each in turn.

## THE COURT'S RESPONSIBILITY TO THE CONSTITUTION

Mr. Aviles Perez begin with a foundational observation. Article III vests the judicial power of the United States in this court no less than in any other federal court, to be exercised in those cases properly before it. U.S. Const. art. III, §§ 1-2. The power to decide cases includes the duty to interpret and apply the Constitution. A district court does not sit as a way station awaiting instruction from above. When a case presents a constitutional question, the court must answer it.

Our legal culture has developed a strange timidity about constitutional interpretation. We often act as if constitutional meaning emerges only from the Supreme Court, as if district courts merely wait for appellate instruction before interpreting constitutional text. That approach inverts the Constitution. In arguments everywhere, lawyers reach for perfect case analogies and factual alignment as if the Constitution itself were somehow inaccessible. But the Constitution is not a compilation of case holdings. It is a text with meaning that existed before any court construed it, and it continues to bind government conduct whether or not a prior case has addressed the specific facts at hand.

To be sure, precedent matters profoundly. When the Supreme Court or the Ninth Circuit has resolved a question, this court follows that resolution. When prior cases illuminate related questions, the court learns from them carefully. Precedent provides predictability, constrains arbitrary interpretation, reflects accumulated judgment, and promotes equal treatment. But it cannot replace the Constitution. When precedent directly resolves the question before the district courts, that ends the inquiry. When prior cases provide clear guidance, district courts follow it. But when existing cases address different facts, different contexts, and different questions, the Constitution still applies. And the district courts must determine what it means through disciplined interpretation, not serial citation.

This is especially true when the government employs practices so recent that doctrine has not yet addressed them. The absence of a case holding that warrant-less, non-exigent, anonymous civil seizures in the interior of the United States violate the Fourth Amendment does not mean the Constitution permits them. It means the practice is new enough, and brazen enough, that no court has yet been required to state the obvious. This court should now be required to say it.

**<u>THE PHILOSOPHICAL FOUNDATION: "WE THE PEOPLE"</u>**

The deepest objection to anonymous government force is not procedural. It runs to the very nature of legitimate government itself and underlies the Fourth Amendment analysis that follows.

In a government of "We the People," every exercise of coercive power is a delegated act. U.S. Const. Preamble; see also James Madison, Federalist No. 49 (Feb. 2, 1788) ("[T]he people are the only legitimate fountain of power, and it is from them that the constitutional charter, under which the several branches of government hold their power, is derived."). The legitimacy of that delegation relies on the ability of the people to verify that the power is being used according to law. See Letter from Thomas Jefferson to Richard Price (Jan. 8, 1789) (on file with the Library of Congress) ("[W]herever the people are well informed they can be trusted with their own government; that whenever things get so far wrong as to attract their notice, they may be relied on to set them to rights."). As James Madison warned, "A popular Government without popular information or the means of acquiring it, is but a Prologue to a Farce or a Tragedy, or perhaps both." Letter from James Madison to W.T. Barry (Aug. 4, 1822) (on file with the Library of Congress).

Our government "of the people, by the people, [and] for the people . . . [,]" Abraham Lincoln, The Gettysburg Address (Nov. 19, 1863), (Available at https://constitutioncenter.org/the-constitution/historic-document-library/detail/abraham-lincoln-the-gettysburg-address-1863?gad_source=1.) thus inherently requires basic democratic principles of transparency and accountability for the government's exercise of power over the people to be legitimate. *Inter-*

*Cooperative Exch. v. U.S. Dep't of Com.*, 36 F.4th 905, 910 (9th Cir. 2022) (explaining "the importance of government transparency in 'maintaining a functional democratic polity, where the people have the information needed to check public corruption, hold government leaders accountable, and elect leaders who will carry out their preferred policies.'" (*quoting Hamdan v. U.S. Dep't of Just.*, 797 F.3d 759, 769-70 (9th Cir. 2015))). The government is a limited one and accountable to the people who are the source of its authority. *See e.g., Marbury v. Madison*, 5 U.S. 137, 176, 2 L. Ed. 60 (1803).

When the state reaches out and takes hold of a human being and deprives him of his liberty, that act must present itself as the people's act. Not eventually. Not upon later inquiry. At the moment it occurs. The person seized is not merely a subject of government power. His liberty is being constrained by an authority that, in a republic, derives from his own consent and the consent of those like him. For that authority to be legitimate, it must be visible as authority at the moment it is asserted. The Supreme Court has explained that individuals knowing "what their Government is up to[,]" *Nat'l Archives & Recs. Admin. v. Favish,* 541 U.S. 157, 171, 124 S. Ct. 1570, 158 L. Ed. 2d 319 (2004) (*quoting U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press,* 489 U.S. 749, 773, 109 S. Ct. 1468, 103 L. Ed. 2d 774 (1989) (cleaned up)), is "a structural necessity in a real democracy." *Id.* at 172. As Justice Brandeis explained, "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." Louis D. Brandeis, What Publicity Can Do, Harper's Weekly, Dec. 20, 1913, at 10.

An anonymized federal police force for civil enforcement contradicts these principles. "Police wield coercive power on behalf of the state -- detaining, searching, and using force under color of law -- and constitutional legitimacy depends on those powers being exercised openly and traceably." Shawn E. Fields, The Anonymous Officer, 13 (2026) (publication forthcoming) (citing West v. Atkins, 487 U.S. 42, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)). Shawn Fields, The Anonymous Officer (Jan. 26, 2026) (available at https://ssrn.com/abstract=6145266 or http://dx.doi.org/10.2139/ssrn.6145266). When unidentifiable agents knock at your door or emerge from an unmarked vehicle armed with firearms and threats of use of deadly force and take hold of a person on an American highway, [or in or outside his motor home], streets or neighborhoods the seizure does not announce itself as the people's authority. It announces only power. The people's will is not expressed in it in any form the person seized, or any witness, can recognize. "Officer anonymity undermines accountability structures that democratic public institutions are designed to maintain." *Id.* at 12-13.

When authority is no longer traceable, it is no longer a legitimate exercise on behalf of the people. The distinction between this scenario and one where a law enforcement officer acts undercover is that "the officers hide their identities not (primarily) to protect themselves from harm

but to protect the secrecy and viability of the investigation" after which their identity is revealed. *Id.* at 8. Otherwise, stops without identification "must remain a rare exception, not the rule." *Doornbos v. City of Chicago,* 868 F.3d 572, 584 (7th Cir. 2017). And those rare instances must not be premised on anonymity for the mere sake of officer protection. If that were so, all officers across America might take to the streets in masks, but that would run contrary to the transparency and accountability our democracy demands.

In a system of checks and balances, the policy of officer anonymity violates the Constitution by evading accountability and judicial review. "The public nature of masked violence reinforces that it is both permissible and shielded from ordinary constraints of liberal democracy, including press scrutiny, civil suits, public identification, and reputation consequences." Fields, The Anonymous Officer at 29. This, the Constitution does not tolerate."This does not resemble the Home of the Brave." *John Doe No. 1 v. Reed,* 561 U.S. 186, 228, 130 S. Ct. 2811, 177 L. Ed. 2d 493 (Scalia, J., concurring). "Where there is no publicity, there is no justice. Publicity is the very soul of justice." Jeremy Bentham, The Works of Jeremy Bentham 355 (1843). Justice Scalia emphasized, transparent civic involvement is an act of "civic courage, without which democracy is doomed." *John Doe No. 1 v. Reed,* 561 U.S. 186, 228, 130 S. Ct. 2811, 177 L. Ed. 2d 493 (2010) (Scalia, J., concurring).

## IMMIGRATION ENFORCEMENT: HISTORICAL CONTEXT

The regulation of immigration has been a concern of the United States since the late eighteenth century. Joseph Summerill, Immigration and Customs Enforcement Introduces "Friendly" Federal Detention Standards and New, Softer Detention Facilities, 59-Sep Fed. Law. 46, 46 (2012). In the 1790s, amidst fears of foreign influence and potential conflict with France, Congress enacted a series of preemptive measures to control the entry of immigrants. Kurt T. Lash & Alicia Harrison, Minority Report: John Marshall and the Defense of the Alien and Sedition Acts, 68 Ohio St. L.J. 435, 438 (2007). These measures culminated in the Alien and Sedition Acts of 1798, which granted federal agents broad discretion to remove individuals deemed dangerous. *Id.* The Alien and Sedition Acts illustrate the early exercise of expansive executive authority over immigration and the attendant risks to individual liberties. *Sessions v. Dimaya,* 584 U.S. 148, 185, 138 S. Ct. 1204, 200 L. Ed. 2d 549 (2018) (Gorsuch, J., concurring) (describing part of the Alien and Sedition Act as "one of the most notorious laws in our country's history . . . understood as a temporary war measure," and "widely condemned as unconstitutional by [James] Madison and many others.").

Immigration enforcement underwent further institutional reform in 1933, when President Franklin D. Roosevelt issued Executive Order 6166, creating the Immigration and Naturalization Service ("INS"). Summerill, supra note 10, at 35. The INS absorbed the immigration and

deportation functions previously divided between the Bureau of Immigration and the Bureau of Naturalization. The INS remained the primary federal immigration agency until the early twenty-first century, when national security concerns prompted further restructuring. Following the September 11, 2001 terrorist attacks, President George W. Bush signed the Homeland Security Act of 2002, which dismantled the INS and established the Department of Homeland Security ("DHS"). Jonathan Thessin, Department of Homeland Security, 40 Harv. J. On Legis. 513, 513 (2003) Under DHS, the former INS duties were transferred to ICE, whose mission encompasses identifying and apprehending undocumented immigrants as well as investigating funds, materials, or activities linked to terrorism or criminal conduct. 6 U.S.C. § 111.

The history of immigration in the United States reveals that "for reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews*, 426 U.S. at 68. Nevertheless, this discretion has consistently pushed constitutional boundaries, particularly in periods of heightened national concern. The Supreme Court has repeatedly emphasized that, despite DHS's broad authority, the agency remains bound by constitutional constraints and may act only through "constitutionally permissible means." *Zadvydas,* 533 U.S. at 695.

Today, ICE's operational practices raise new constitutional concerns. *See Juan T.R. v. Noem,* No. 26-cv-01077 (PJS/DLM), 2026 U.S. Dist. LEXIS 20363, 2026 WL 232015, at *1 (D. Minn. Jan 28, 2026) ("Attached to this order is an appendix that identifies 96 court orders that ICE has violated in 74 cases. The extent of ICE's noncompliance is almost certainly substantially understated.").While undercover operations in organized crime or anti-terrorism units may justify limited identity concealment, (The Seventh Circuit held that defendant officers acted reasonably under the Fourth Amendment when they failed to identify themselves as police officers because they believed they were confronting an "armed and dangerous felon who had announced his intention to flee or fight rather than be arrested." *Catlin v. City of Wheaton,* 574 F.3d 361, 366 (7th Cir. 2009)). Routine immigration enforcement lacks such extraordinary circumstances. When the public cannot readily determine who is acting under government authority, it is difficult to regard the actions as legitimate exercises of law enforcement power.

The use of masks and **other tactics** that obscure official identity carries historical and semiotic weight. Authoritarian regimes have used masked security forces to intimidate and control populations. In this nation's history, the Ku Klux Klan relied on masks to terrorize victims while concealing accountability. Brandon Marc Draper, Masq-or-Raid: Why Concealing Cops' Identities Creates Reasonable Doubt When Cops Are Victims, 104 Tex. L. Rev. Online 155, 160 (2025).

With this background in mind, the ICE tactics of anonymous enforcement in Mr. Aviles

Perez case contravene the history, purpose, and modern interpretation of the Fourth Amendment.

## HISTORICAL CONTEXT OF THE FOURTH AMENDMENT

The history of the Fourth Amendment confirms that the type of anonymized and indiscernible policing presented here is precisely what the Fourth Amendment was written to prevent. Proposed during the First Congress and ratified on December 15, 1791, the Fourth Amendment emerged directly from the Founding generation's experience with abusive search and seizure practices under British rule. *See* Barry Friedman & Orin Kerr, Common Interpretation: The Fourth Amendment, Constitution Center, https://constitutioncenter.org/interactive-constitution/amendments/amendment-iv (last visited February 19, 2026) (stating that the Fourth Amendment was born out of concern of the impact of general warrants, which allowed the Crown's messengers to search for evidence of a crime without any limitations under English Law); Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 576-90 (1999) (cataloging the various interpretations of the Fourth Amendment in light of the Framers' goal to "prevent unjustified searches and arrests" and provide "a preventative strategy by consistently prohibiting even the issuance of a too-loose warrant"); Tracey Maclin, The Central Meaning of the Fourth Amendment, 35 Wm. & Mary L. Rev. 197, 213 (1993) ("There is universal agreement that these law enforcement tools were the specific evils the framers intended to condemn through the Fourth Amendment."). *See also Carpenter v. United States*, 585 U.S. 296, 305, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018) (recognizing that the Fourth Amendment was adopted to "place obstacles in the way of a too permeating police surveillance" and secure "the privacies of life against arbitrary power") (citation modified). It was shaped by widespread colonial outrage ("In fact, as John Adams recalled, the patriot James Otis's 1761 speech condemning writs of assistance was 'the first act of opposition to the arbitrary claims of Great Britain' and helped spark the Revolution itself." *Carpenter,* 585 U.S. at 303-04 (*quoting Riley v. California,* 573 U.S. 373, 403, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014)), over the use of general warrants and writs of assistance, blanket authorizations that allowed British officials to conduct sweeping, suspicionless searches without constraint or attribution. *Carpenter v. United States*, 585 U.S. 296, 303, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018). This outrage culminated in three landmark cases that laid the groundwork for the Founders' rejection of general warrants: *Entick v Carrington,* 19 How St Tr 1029 (CP 1765); *Wilkes v Wood,* 19 How St Tr 1153 (CP 1763); and *Leach v Money*, 19 How St Tr 1001 (KB 1765). See Laura K. Donohue, The Original Fourth Amendment, 83 U. Chi L. Rev. 1181, 1196-1207 (2016). In these cases, the courts held that executive officers lacked statutory or common-law authority to issue or execute general warrants authorizing the arrest of unnamed persons and the sweeping search and seizure of private papers, establishing that such indiscriminate intrusions

constituted trespass and violated fundamental protections of property and liberty. *See id.* at 1196-2016.

Against this backdrop, the Framers sought to erect firm constitutional barriers against unchecked government power. A central aim of the Fourth Amendment was, as the Supreme Court later observed, "to place obstacles in the way of a too permeating police surveillance." *United States v. Di Re*, 332 U.S. 581, 595, 68 S. Ct. 222, 92 L. Ed. 210 (1948). The Amendment's text embodies this objective by conditioning searches and seizures on reasonableness and by requiring that warrants issue only upon probable cause, supported by oath or affirmation, and with particularized descriptions of the places to be searched and the persons or things to be seized. U.S. Const. amend. IV.

While rooted in eighteenth-century abuses, the Fourth Amendment has proven adaptable to evolving forms of governmental intrusion. *See, e.g., Kyllo v. United States*, 533 U.S. 27, 34, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (holding that, absent a warrant, the government may not use new sense-enhancing technology to explore the interior of a home); *Riley v. California*, 573 U.S. 373, 401, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014) (holding that police officers must generally obtain a warrant before searching the contents of a cell phone); *Carpenter*, 585 U.S. at 320 (holding that the government must generally obtain a warrant before acquiring cell-site location information from a wireless carrier). Although historically tied to property. For much of its history, the Fourth Amendment was "'tied to common-law trespass' and focused on whether the Government 'obtains information by physically intruding on a constitutionally protected area.'" *Carpenter*, 585 U.S. at 304 (*quoting United States v. Jones*, 565 U.S. 400, 405, 406 n.3, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012)). the Supreme Court has recognized that "property rights are not the sole measure of Fourth Amendment violations." *Soldal v. Cook County*, 506 U.S. 56, 64, 113 S. Ct. 538, 121 L. Ed. 2d 450 (1992).

The modern era of Fourth Amendment jurisprudence began in 1967 with *Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967), which reframed the Amendment's protections around "reasonable expectations of privacy" rather than rigid property concepts. There, the Supreme Court established that "the Fourth Amendment protects people, not places." *Id.* at 351. In the decades since, the Supreme Court has used this approach to build a grand edifice of Fourth Amendment doctrine, interpreting the Amendment as securing the right of individuals "to personal security and privacy," free of "arbitrary and abusive" governmental interference. *Brown v. Texas*, 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979).

The Fourth Amendment's enduring purpose of restraining arbitrary power governs searches, seizures, and identification demands across both criminal and civil contexts, including immigration enforcement. *See, e.g., Torres v. Madrid*, 592 U.S. 306, 321, 141 S. Ct. 989, 209 L. Ed. 2d 190

(2021); *Grady v. North Carolina*, 575 U.S. 306, 307-11, 135 S. Ct. 1368, 191 L. Ed. 2d 459 (2015) (holding that a civil program that used GPS ankle bracelets to monitor recidivist sex offenders was a violation of the Fourth Amendment and constituted a search); *INS v. Delgado,* 466 U.S. 210, 216, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984) (explaining that absent a reasonable suspicion of misconduct, detaining an individual to determine his identity when the individual refuses to show his identification violates the Fourth Amendment); *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979) ("[W]hen the officers detained [defendant] for the purpose of requiring him to identify himself, they performed a 'seizure' of his person subject to the requirements of the Fourth Amendment.").

Though the precise contours of a noncitizen's Fourth Amendment protections remain unsettled, the Supreme Court has recognized that the Amendment extends to noncitizens who have "substantial connections" to the United States. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272-73, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 881-82, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975) ("For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens."); *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1046, 104 S. Ct. 3479, 82 L. Ed. 2d 778 (1984) (assuming, without deciding, that the Fourth Amendment applied to illegal aliens in the United States and stressing the importance of "Fourth Amendment rights of all persons"). The Supreme Court has delineated the scope of other constitutional rights afforded to noncitizens. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 211-212, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) (illegal aliens protected by Equal Protection Clause); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 73 S. Ct. 472, 97 L. Ed. 576 (1953) (resident alien is a "person" within the meaning of the Fifth Amendment); *Bridges v. Wixon*, 326 U.S. 135, 148, 65 S. Ct. 1443, 89 L. Ed. 2103 (1945) (resident aliens have First Amendment rights); *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 51 S. Ct. 229, 75 L. Ed. 473, 71 Ct. Cl. 785 (1931) (Just Compensation Clause of Fifth Amendment); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S. Ct. 977, 41 L. Ed. 140 (1896) (resident aliens entitled to Fifth and Sixth Amendment rights); *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S. Ct. 1064, 30 L. Ed. 220 (1886) (Fourteenth Amendment protects resident aliens). Several circuit courts have similarly recognized or assumed that the Fourth Amendment applies to noncitizens and citizens alike. *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) ("[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike."); *Carcamo v. Holder,* 713 F.3d 916, 921 (8th Cir. 2013) ("We have observed that the Fourth Amendment, which

protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' applies as much to illegal aliens inside this country as it does to citizens."); *see also United States v. Murillo-Lopez,* 151 F.4th 584, 589-90 (4th Cir. 2025) (addressing noncitizens' Fourth Amendment challenge to stop).

There can be no doubt that the Mr. Aviles Perez has substantial connections to the country and enjoys rights guaranteed by the Fourth Amendment. (See ATTACHMENT "A"). He arrived in the United States on or about 2013 and has lived and worked continuously here to be able to provide a better life for himself for the past 13 years.

The doctrinal uncertainty, however, when coupled with expansive enforcement authority, risks undermining the Framers' original objective by chilling the exercise of constitutional freedoms among vulnerable populations. Noncitizens may hesitate to assert their rights out of fear of government retaliation. In practice, undocumented immigrants may endure unreasonable searches and seizures rather than risk asserting Fourth Amendment protections that may or may not apply. In this way, the Fourth Amendment, intended by the Founders as a shield for individual liberty, is turned into a sword. This Court should not let Mr. Aviles Perez be one more of these undocumented individuals.

Congress frequently enacts laws in hopes of regulating immigration, creating "rules that would be unacceptable if applied to citizens." *Mathews v. Diaz,* 426 U.S. 67, 79-80, 96 S. Ct. 1883, 48 L. Ed. 2d 478 (1976). Yet, as Justice Stevens emphasized, "even one whose presence in this country is unlawful, involuntary, or transitory is entitled to . . . constitutional protection." *Id.* at 77.

From its origins in resistance to colonial overreach to its modern application in an era of advanced surveillance and expansive enforcement regimes, the Fourth Amendment reflects a continuous historical effort to ensure that governmental power is exercised within defined constitutional limits.

The Founders recognized that freedom is imperiled not only when government actions lack legal justification, but also when those actions are carried out by agents whose authority is unchecked and whose actions cannot be traced. In this light, a warrantless, anonymous civil seizure like the one at issue in Mr. Aviles Perez's case is merely a general warrant in modern dress. Masking and anonymization of officers, armed with military assault weapons and using unmarked vehicles, therefore, are fundamentally inconsistent with the historical understanding of the Fourth Amendment.

After considering the history of the Amendment, one need only look to the actual text. The Fourth Amendment guarantees the people the right "to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. ICE agents masking or disguising themselves as construction or city workers hiding their identities, luring petitioner out of his motor

home with false pretenses, assaulting and beating Mr. Aviles Perez and using unmarked vehicles in this case clearly violates both the Petitioner's right to be secure and his right against unreasonable searches and seizures.

## SECURITY GUARANTEED BY THE FOURTH AMENDMENT

"[T]he Fourth Amendment preserves personal security with respect to methods of apprehension old and new." *Torres*, 592 U.S. at 317, 324 ("[T]he text of the Fourth Amendment expressly guarantees the 'right of the people to be secure in their persons," and our earliest precedents recognized privacy as the 'essence" of the Amendment . . . ."). At its core, it prohibits "arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Martinez-Fuerte,* 428 U.S. at 554. The conduct of ICE in this case does not survive constitutional muster pursuant to these standards.

Security is not simply freedom from unjustified intrusion. It describes a condition of living wherein one lives under law rather than arbitrary or oppressive power. And living under the law includes possessing a practical means to insist on rights while retaining the ability to hold government actors accountable for abuse. Fourth Amendment law is premised on a very basic assumption: that individuals know they are dealing with a legitimate law enforcement officer acting under the color of law when they are being seized.

When officers can wear a mask, hide their true identity behind construction or city workers costumes, fail to verify their credentials, refuse to disclose their name, arrive in an unmarked vehicle, accost a person under false pretenses, and neglect to provide a justification for their seizure of an individual, the constitutional protection that the Framers envisioned has not just been corroded--it has been eviscerated.

But the People, protected by the Constitution, are not without recourse. The ability to seek redress is inseparable from the right to be secure. Thomas Y. Davies, Recovering the Original Fourth Amendment, 98 Mich. L. Rev. 547, 576 (1999) (The Framers had redress in mind as they "sought to prevent unjustified searches and arrests from occurring, not merely to provide an after-the-fact remedy for unjustified intrusions."); *see also id.* at 701 ("[T]he evidence suggests that [the Framers] would have expected, at a minimum, that courts would decline to enforce legislation that conflicted with the essential rights announced in the Constitution."). Consider the judicially crafted remedy of exclusion for Fourth Amendment violations. *Davis v. United States,* 564 U.S. 229, 236, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011) (The exclusionary rule — suppressing evidence obtained in violation of the Fourth Amendment — is a "prudential doctrine" to "compel respect for the constitutional guaranty" (*quoting Elkins v. United States*, 364 U.S. 206, 217, 80 S. Ct. 1437, 4 L. Ed. 2d 1669 (1960)). And in Article III standing analysis, redressability is a prerequisite to

jurisdiction. *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338, 136 S. Ct. 1540, 194 L. Ed. 2d 635 (2016). In *Christopher v. Harbury,* 536 U.S. 403, 412, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002), the Court found that a due process "access to courts" claim exists when 1) the government deliberately conceals information, 2) which renders the plaintiff's underlying cause of action impossible, and 3) the loss is irreparable because the opportunity to sue is now gone. One's right to be secure in their person protects not only against interference but also ensures the practical ability to challenge unlawful intrusion. **When officers can conceal their identity,** the system effectively collapses. Individuals lack the information necessary to report misconduct for meaningful judicial review or internal investigation. Officers are thereby emboldened to exercise their power in an arbitrary and oppressive manner. And public trust is decimated.

There is practical danger as well. When masked individuals in unmarked vehicles or federal agents hide their identity pretending to be someone else without any insignia that identifies them as law enforcement officers or federal agents seize someone on the streets or the highway, nothing visible distinguishes lawful enforcement from kidnapping. Federal regulations recognize as much, requiring agents to identify themselves when "practical and safe" to do so. 8 C.F.R. § 287.8(c)(2)(iii); see also 42 U.S.C. § 14141. The consequences of abandoning this requirement are well documented: in Florida, a man posed as an ICE agent to coerce immigrants into providing identification, and in North Carolina, an individual committed sexual assault under the guise of immigration enforcement. Peter D'Abrosca, Florida man impersonates ICE agent, threatens to deport 2 men, police say, Fox News (Apr. 7, 2025 at 12:11 PM EDT), https://www.foxnews.com/us/florida-man-impersonates-ice-agent-threatens-deport-2-men-police-say?msockid=330899fd96e06c4f2d958cb6978a6dc6 (Police arrested a Florida man who posed as an ICE agent, demanded identification of two individuals, and threatened to deport them.); Luke Tucker, Man accused of impersonating ICE officer, sexually assaulting woman at Raleigh motel, WBTV (Jan. 29, 2025 at 7:22 AM EST), https://www.wbtv.com/2025/01/29/man-accused-impersonating-ice-officer-sexually-assaulting-woman-raleigh-motel/ (A North Carolina man was arrested after he allegedly "entered the motel and threatened to deport the woman if she did not have sex with him" after telling her he was "sworn law-enforcement" and showing "her a business card with a badge on it."). See also Jose Olivares, US sees spate of arrests of civilians impersonating Ice officers, The Guardian (June 28, 2025 at 5:14 PM EDT), https://www.theguardian.com/us-news/2025/jun/28/civilians-impersonating-ice-officers (recounting instances of civilians impersonating ICE officers to enter property, assault people, and question members of the public); Artemis Moshtaghian, Gloria Pazmino, and Nick Valencia, Multiple ICE impersonation arrests made during nationwide immigration crackdown, CNN (Feb. 5, 2025 at 1:35 PM EST), https://www.cnn.com/2025/02/04/us/ice-impersonators-on-the-rise-arrests-made-as-

authorities-issue-national-warning (describing impersonations in South Carolina, Pennsylvania, and North Carolina); Sam Levin, The alarming rise of US officers hiding behind masks: 'A police state', The Guardian (June 25, 2025 at 8:00 AM EDT), https://www.theguardian.com/us-news/2025/jun/25/immigration-officers-wearing-masks ("when real agents use masks more frequently, it becomes easier for imposters to operate"); Rebecca Beitsch, FBI urges ICE to ID themselves as criminals impersonate officers, MSN (Nov. 5, 2025) https://www.msn.com/en-us/news/us/fbi-urges-ice-to-id-themselves-as-criminals-impersonate-officers/ar-AA1PS17G (In response to "a string of cases in which those impersonating U.S. [ICE] officers committed crimes, such as kidnapping and assault," the FBI warned that individuals are targeting vulnerable communities and committing criminal activity by impersonating federal officers.). These incidents have generated widespread fear within immigrant communities, affecting routine activities such as sending children to school, grocery shopping, and attending recreational events. Jake Offenhartz, Hard hats and dummy plates: Reports of ICE ruses add to fears in Minnesota, AP News (Feb. 8, 2026 at 12:08 AM EST), https://apnews.com/article/immigration-ice-agents-minneapolis-ruse-54ca86155182edceeda68e649b5518f7 (describing "heightened fears" of plain clothes immigration enforcement amid the administration's "dramatic reshaping of immigration enforcement tactics nationwide"); Meg Anderson, The ICE surge is fueling fear and anxiety among Twin Cities children, NPR (Jan. 22, 2026 at 4:01 AM EST), https://www.npr.org/2026/01/22/nx-s1-5676035/minneapolis-ice-fear-anxiety-children (describing the isolation and fear of immigrants and citizens alike).

**Validating law enforcement conduct that invites impersonation and undermines public trust would contaminate Fourth Amendment principles**. As we have seen, when officers are faceless and nameless, others can exploit that anonymity for personal gain or criminal acts. This approach poses a serious public safety risk, endangers personal security, and increases the danger of law enforcement work-because the public cannot distinguish officials from imposters. Individuals understandably refuse to cooperate when they cannot tell the difference between a government agent and a criminal actor. This is precisely the kind of insecurity the Framers sought to prevent when they enshrined personal security in the Fourth Amendment.

**The Fourth Amendment's "Reasonableness" Requirement**

The Fourth Amendment also promises that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV (emphasis added). The "basic purpose of this Amendment, as recognized in countless decisions of [the Supreme Court], is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Muni. Ct. of City and Cnty. of S. F.,* 387 U.S. 523, 528, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967). In light of this broad

constitutional guarantee, jurists have struggled over how to apply the Fourth Amendment to myriad federal action. Modern interpretation has developed an unspoken tendency to treat reasonableness as synonymous with process --that is, to assume that the people's "right to be secure" is preserved as long as government agents follow judicially crafted procedures. *Lange v. California,* 594 U.S. 295, 301-02, 141 S. Ct. 2011, 210 L. Ed. 2d 486 (2021) (reciting the Court's various "exigent circumstances" exceptions to the Fourth Amendment's warrant requirement); *Birchfield v. North Dakota,* 579 U.S. 438, 476, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016) ("[A] breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving."); *Florida v. Wells,* 495 U.S. 1, 4, 110 S. Ct. 1632, 109 L. Ed. 2d 1 (1990) (Warrantless inventory searches must be regulated by "standardized criteria" or "established routine."); *Georgia v. Randolph*, 547 U.S. 103, 120, 126 S. Ct. 1515, 164 L. Ed. 2d 208 (2006) (An occupant of a residence can consent to a warrantless search, but a warrantless search of a residence is unreasonable if a second resident, physically present, expressly refuses to consent.); *Caniglia v. Strom*, 593 U.S. 194, 199, 141 S. Ct. 1596, 209 L. Ed. 2d 604 (2021) (The Court reaffirmed a constitutional difference between what is reasonable regarding vehicles versus homes, and it has interpreted differing protections of each.). The problem is this: proceduralizing the Fourth Amendment shortens its reach. To be sure, this practice creates reliable administrability and provides notice to the public in an increasingly polarized and technological world. *See Lange*, 594 U.S. at 302 (Due to the "nature of emergencies," the Court reviews exigent circumstances challenges on a "case-by-case basis." (*quoting Birchfield v. North Dakota,* 579 U.S. 438, 457, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016)). *See also Carpenter v. United States,* 585 U.S. 296, 309, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018) (Applying the Fourth Amendment to the "new phenomenon" of being able to "chronicle a person's past movements through the record of his cell phone signals") *and Riley*, 573 U.S. at 403 ("The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.") (2014); *but see Gonzalez v. United States*, 604 U.S. ---, 145 S.Ct. 529, 532, 221 L. Ed. 2d 259 (2025) ("As explained, however, this Court has said that the Fourth Amendment must at minimum provide those protections that the common law guaranteed.") (denying cert petition).

The Amendment protects far more than mere adherence to procedural rules. Its prohibition on unreasonable searches and seizures carries substantive meaning that exists prior to and independent of any procedural test. The Court observed that: The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The Constitution does not

define "unreasonable," but neither is reasonableness exhausted by the requirement of a warrant and probable cause. While the Supreme Court has attempted to fit reasonableness into a warrant-and-exception framework, the prohibition on "unreasonable searches and seizures" does independent constitutional work. *See Kentucky v. King*, 563 U.S. 452, 459, 131 S. Ct. 1849, 179 L. Ed. 2d 865 (2011).

Indeed, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). Courts are well acquainted with the reasonableness inquiry. **The Supreme Court has repeatedly held that even when a search or seizure is otherwise justified, the Fourth Amendment still governs the manner in which it is carried out. Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) ("[I]t is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out.").** The Court has, for example, imposed limits on the reasonable force officers may use, on the reasonable methods for stopping and seizing a moving vehicle, and on the reasonable ways to enter a residence. *Barnes v. Felix*, 605 U.S. 73, 79, 145 S. Ct. 1353, 221 L. Ed. 2d 751 (2025) (the question was whether the force deployed was justified from the perspective of a reasonable officer on the scene); *Plumhoff v. Rickard,* 572 U.S. 765, 777, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014) (officers acted reasonably "in using deadly force" to end a high speed car chase that lasted nearly five minutes); *Tennessee v. Garner*, 471 U.S. 1, 11, 105 S. Ct. 1694, 85 L. Ed. 2d 1 (1985) ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."); *Graham v. Connor,* 490 U.S. 386, 395, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (holding that all officer excessive force claims should be analyzed under the Fourth Amendment and its "reasonableness" standard); *Scott v. Harris,* 550 U.S. 372, 381, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (holding that an officer acted reasonably when he rammed his car bumper into another's vehicle to terminate a chase and seize the individual); *United States v. Sharpe*, 470 U.S. 675, 688, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985) (holding that "a 20-minute stop is [not] unreasonable when the police have acted diligently and a suspect's actions contribute to the added delay"); *Terry*, 392 U.S. at 27 (permitting officers to conduct a "reasonable search for weapons" where there is "reason to believe that [they are] dealing with an armed and dangerous individual" regardless of probable cause); *Case v. Montana,* 607 U.S. , 146 S. Ct. 500, 508, 223 L. Ed. 2d 382 (2026) (reaffirming Brigham City's holding that an "officer may enter a home without a warrant if he has 'an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury.'" (quoting 547 U.S. at 400)); *United States v. Banks,* 540 U.S. 31, 38-42, 124 S. Ct. 521, 157 L. Ed. 2d 343 (2003) (applying a reasonableness analysis to the amount of time officers must wait between knocking and entering a residence); *United States v. Ramierz*, 523 U.S. 65, 71-72, 118 S. Ct. 992, 140 L. Ed. 2d 191 (1998) (The

manner in which officers entered a home ㅂ by breaking a single window in a garage ㅂ was reasonable.).

Therefore, "reasonableness" is the proper inquiry to consider the consistent masking of federal ICE agents, the deployment of such agents in unmarked particular vehicles, armed with military assault weapons, agents disguised of construction or city workers to hide their true identity to enforce civil immigration laws. Fourth Amendment reasonableness considers the totality of the circumstances. *Barnes,* 605 U.S. at 80. "There is no 'easy-to-apply legal test' or 'on/off switch' in this context." *Id.* (*citing Scott*, 550 U.S. at 382-83). Yet, the assessment "takes into account . . . 'the whole picture.'" *Navarette v. California*, 572 U.S. 393, 397, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014) (*quoting United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). In many circumstances, "it is generally not reasonable for a plainclothes officer to fail to identify himself when conducting a stop." *Doornbos,* 868 F.3d at 583; *Yates v. City of Cleveland,* 941 F.2d 444, 447 (6th Cir. 1991). The totality of the circumstances justifying a failure to identify as law enforcement is narrowed to those instances "where the act of [identification] could itself reasonably be thought to have made the situation more dangerous" based on specific-not speculative-knowledge of danger. *Doornbos*, 868 F.3d at 583-86 (*citing Catlin v. City of Wheaton,* 574 F.3d 361, 365-68). "Absent reasonable grounds to think that identification would present an unusual danger, it is generally not a reasonable tactic" to fail to identify. *Id.* at 584 (emphasis added).

Here, Petitioner asks the court to assess whether the manner of his seizure was reasonable, and this analysis is guided by the totality of the circumstances. **The Fourth Amendment requires that authority be visible, attributable, and recognizable at the moment it is exercised**. Immigration enforcement is distinguishable from the *Doornbos* officer in a material way: we are not merely dealing with a plainclothes officer who fails to self-identify-we are dealing with groups of masked individuals arriving in unmarked vehicles, without badges or a means of discerning who they are, disguised as a construction or city workers hiding their true identities, wagging threats of using deadly force. **THEY are the problem that the court in *Doornbos* foreshadowed: a presence indistinguishable from lawbreakers. 868 F.3d at 585.**

## THE GOVERNMENT'S JUSTIFICATION DOES NOT WITHSTAND SCRUTINY

Mr. Aviles Perez is not asking this Court to hold that government authority must always be announced in advance or that concealment is never permissible. There are genuine exigencies the Constitution accommodates. An undercover officer infiltrating a criminal organization cannot reveal his identity without destroying the investigation and endangering his life. An agent serving a warrant on an armed and dangerous suspect may have specific, articulable reasons for temporary

concealment. In such cases the concealment is particularized, temporary, and subject to subsequent accountability. The undercover officer eventually testifies under his own name. The warrant is returned to the magistrate. The operation is subject to review. Accountability is deferred in those cases, not abandoned.

That is the critical distinction. What justifies concealment in genuine exigencies is that it is exceptional. Stops without identification must remain rare exceptions, not routine practice. *Doornbos,* 868 F.3d at 584 (permitting plainclothes officers to initiate stops without identifying themselves "must remain a rare exception, not the rule"). Anonymous policing "provokes panic and hostility from confused civilians who have no way of knowing that the stranger who seeks to detain them is an officer." *Doornbos*, 868 F.3d at 584. **"Self-defense is a basic right,"** *McDonald v. City of Chicago,* 561 U.S. 742, 767, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010), "and many civilians who would peaceably comply with a police officer's order will understandably be ready to resist or flee when accosted-let alone grabbed-by an unidentified person who is not in a police officer's uniform." *Doornbos,* 868 F.3d at 585.

What is happening here bears no resemblance to those recognized exceptions. This is not an undercover operation. No specific danger has been identified that required these agents to be masked and disguised to hide their true identities for this arrest and to effectuate it the manner that it was carried out, by assaulting and beating Mr. Aviles Perez, by these federal agents. This is a deliberate choice to conduct routine civil immigration enforcement through masked anonymous agents operating without warrants across the interior of the United States..

**When concealment becomes policy rather than exception, the government has not invoked an exigency. It has abolished the rule that exigency was meant to qualify.**

What is left after considering the narrow and exceptional circumstances where officer anonymity may be appropriate? The Government's justification for ICE officer masking-SAFETY. When this court examines that justification carefully it should find it insufficient.

A mask or a disguise costume does not stop a bullet. It does not deflect a blow. It provides no physical protection that the tactical equipment these officers already carry does not provide. A mask or a disguise custome does one thing: it hides the face of the officer wearing it and it hides the true identity of the agents as . On a public highway, in a civil arrest of a person suspected of no crime, the only purpose served by hiding an officer's face or disguise themselves of something else that their are not is to prevent his identification. And preventing identification serves only to eliminate accountability.

**A law enforcement practice whose sole operational effect is the elimination of accountability is not a safety measure. It is a constitutional deficiency wearing the name of one.**

The point runs much deeper than the inadequacy of the government's justification. Every public official who exercises coercive power assumes some personal exposure as the price of legitimate authority. Judges sentence. Prosecutors accuse. Officers seize. None is entitled to anonymity as a default condition of exercising state force.

The officer who arrests a person stands in no different constitutional position than the judge who sentences him or the prosecutor who sought the conviction. All exercise delegated authority. All do so under their own names and in their own persons, because accountability is not a burden imposed on public officials as a matter of grace. It is the structural condition of their authority. Remove it and what remains is not law enforcement. It is force without a face, which is another name for the thing the Fourth Amendment was written to prevent.

Judge Young, federal district court judge for the District of Massachusetts, recently observed:

> And there's the issue of masks. This Court has listened carefully to the reasons given . . . for masking-up and has heard the same reasons advanced by the defendant Todd Lyons, Acting Director of ICE. It rejects this testimony as disingenuous, squalid and dishonorable. ICE goes masked for a single reason -- to terrorize Americans into quiescence. Small wonder ICE often seems to need our respected military to guard them as they go about implementing our immigration laws. It should be noted that our troops do not ordinarily wear masks. Can you imagine a masked marine? It is a matter of honor-and honor still matters. To us, masks are associated with cowardly desperados and the despised Ku Klux Klan. In all our history we have never tolerated an armed masked secret police. Carrying on in this fashion, ICE brings indelible obloquy to this administration and everyone who works in it. *Am. Ass'n of Univ. Professors v. Rubio,* 802 F. Supp. 3d 120, 174 (D. Mass. 2025) (emphasis added). The District Court for the District of Columbia has similarly found the Government's justification for masking unpersuasive, calling transparency in law enforcement a "matter of honor." *Escobar Molina v. DHS,* F. Supp. 3d , 2025 U.S. Dist. LEXIS 234930, 2025 WL 3465518, at *37 (D.D.C. 2025) ("Requiring defendants to put pen to paper and explain who made each arrest and why constitutes the bare minimum to ensure defendants are compliant with the Constitution, the INA, and this Court's order, given the blatant misstatements about the INA's requirements for such arrests repeatedly espoused by DHS high-ranking officials.").

The constitutional rule this court should apply is not that masks are categorically forbidden. The rule is that a practice whose sole operational effect is the elimination of accountability, deployed as routine civil enforcement without warrant or articulable exigency, is unreasonable under the Fourth Amendment.

In this case, masking combined with men disguised as construction or city workers in and out of unmarked vehicles, threatening the use of deadly force, assaulting and beating Mr. Aviles Perez senseless, absence of identification, absence of any warrant, and no post-seizure mechanism for attribution is that practice that Mr. Aviles Perez brings to this Court's attention. The conclusion

follows from the premise without any categorical leap.

Absent genuine, particularized necessity, the Fourth Amendment's reasonableness requirement prohibits government officers from executing a civil arrest while systematically concealing their identities in a manner that eliminates contemporaneous and subsequent accountability.

**Mr. Aviles Perez cannot identify the agents who seized him, assaulted him and beat him. He knows the seizure occurred at a particular place and time, but he cannot name the individuals, attribute their conduct, or identify who used force, who made statements, or who violated what procedure. The seizure is functionally unanswerable. That is not a procedural gap. It is the elimination of constitutional accountability itself.**

Masking and disguising during arrests is therefore not a neutral safety measure; it is a deliberate choice that transforms the nature of the seizure from lawful authority into anonymous coercion. As a matter of constitutional law, the Fourth Amendment does not permit this transformation absent genuine, particularized necessity. **The Amendment's reasonableness requirement mandates that government officers identify themselves during arrests to ensure that seizures are perceived as lawful at the moment they occur, thereby preserving the balance between state authority and individual liberty.**

## THE FIFTH AMENDMENT

### PETITIONER IS DETAINED UNDER 8 U.S.C. § 1226(a)

District Courts have previously addressed at length which statutory framework governs detention of persons arrested in the interior of the United States. *See Aroca v. Mason,* No. 2:26-cv-00057, F. Supp. 3d , 2026 U.S. Dist. LEXIS 26337, 2026 WL 357872, at *11 a*20 (S.D. W. Va. Feb. 9, 2026). As this court has held, and as nearly every district court to examine the question has concluded, 8 U.S.C. § 1225(b)(2)(A) does not apply to noncitizens arrested in the interior of the country who are not seeking admission. Noncitizens already present in the United States are governed by 8 U.S.C. § 1226(a), which provides for discretionary detention and requires individualized custody determinations. Applying that analysis here, the Petitioner's continued detention lacks statutory authority. As in *Aroca*, "[n]othing in the record suggests [Petitioner was] actively seeking admission at the time of [his] arrest." *Aroca*, 2026 U.S. Dist. LEXIS 26337, 2026 WL 357872 at *17. The record will reflect that Petitioner entered the United States on or about 2013, has maintained stable work, bought himself a motor home worth $12000.00 has since resided here, has formed strong ties to his community, Mr. Aviles Perez has built a better life than the one he had as an orphan in El Salvador, and Mr. Aviles Perez is currently in the asylum process with an individually merits hearing for August 26, 2026. Those facts are inconsistent with treatment as an

applicant seeking admission under § 1225(b)(2)(A).

**PETITIONER'S DUE PROCESS RIGHTS WERE VIOLATED**

The Fifth Amendment's Due Process Clause independently requires the same result. As the Supreme Court has explained, "Freedom from imprisonment--from government custody, detention, or other forms of physical restraint-lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. That protection is not limited to citizens. "No person shall be . . . deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. (emphasis added); *Zadvydas,* 533 U.S. at 693 ("[O]nce an alien enters the country, the legal circumstance changes, for the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *Plyler v. Doe,* 457 U.S. 202, 210, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) ("Indeed, we have clearly held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government."); *Reno v. Flores,* 507 U.S. 292, 307, 113 S. Ct. 1439, 123 L. Ed. 2d 1 ("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."). It extends to noncitizens, including those in removal proceedings. *Id.* at 693 ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."); *see also Reno v. Flores*, 507 U.S. 292, 306, 113 S. Ct. 1439, 123 L. Ed. 2d 1 (1993).

Due process is not satisfied by the existence of legal authority somewhere in the United States Code. It is satisfied only through constitutionally adequate procedure. The "essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" *Mathews v. Eldridge,* 424 U.S. 319, 348, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (*quoting Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 171-72, 71 S. Ct. 624, 95 L. Ed. 817 (1951) (Frankfurter, J., concurring)). That requires, at minimum, notice, a meaningful opportunity to be heard, and adjudication by a neutral decisionmaker. Administrative convenience has never been a substitute for constitutional process. The Constitution does not yield to efficiency.

Here, Mr. Aviles Perez received none of what due process requires. He was seized without warrant, assaulted and beaten by five men disguised as construction or city workers, given no notice of the basis for his detention, and transported to, among other locations, Otay Mesa Detention Center where is currently unlawfully detained without any opportunity to be heard before a neutral decisionmaker. What the government offered instead was a fait accompli: seizure, transport, imprisonment, and the suggestion that review could be sought of a deprivation already complete, through mechanisms controlled by the detaining authority. That is not due process. It is the absence of it.

"The issue here is not the permissibility of immigration detention, but rather the process required in connection with such detention." *Valdez v. Joyce*, 803 F. Supp. 3d 213, 2025 WL 1707737, at *3 (S.D.N.Y. June 18, 2025). Treating the immigration process as "a game of detention roulette" is inconsistent with the constitutional guarantee of due process. *Lopez Benitez,* 795 F. Supp. 3d at 499. "[T]he government's discretion to incarcerate non-citizens is always constrained by the requirements of due process." *Hernandez,* 872 F.3d at 981, 990 n.17 (*citing Zadvydas*, 533 U.S. at 695). "A statutory violation is a failure to follow the law. A knowing constitutional violation is a refusal to be bound by it." *Aroca,* 2026 U.S. Dist. LEXIS 25320, 2026 WL 357872, at *19.

**REMEDY**

Mr. Aviles Perez truly believes he has met his burden of proving he is being held contrary to law. *Walker*, 312 U.S. at 286. He seeks the "typical remedy" for "unlawful executive detention," which "is, of course, release." *Munaf v. Geren,* 553 U.S. 674, 693, 128 S. Ct. 2207, 171 L. Ed. 2d 1 (2008). "[T]he traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973). It is the "usual remedy by which a man is restored again to his liberty, if he ha[s] been against law deprived of it. *Id.* (internal citation omitted).

Accordingly, Petitioner's immediate release is warranted. *See Larrazabal-Gonzalez,* 2026 U.S. Dist. LEXIS 15796, 2026 WL 221706, at *5 ("There is no process to await. The Constitution requires release."); *accord Quijada Cordoba v. Knight,* No. 1:25-CV-00605-BLW, 2025 U.S. Dist. LEXIS 228973, 2025 WL 3228945, at *9 (D. Idaho Nov. 19, 2025) (collecting cases of "courts across the country [that] have ordered the immediate release of detainees in similar situations" and ordering the release of a petitioner who challenged his detention without a bond hearing); *Yao v. Almodovar,* No. 25-CV-9982, 2025 U.S. Dist. LEXIS 261200, 2025 WL 3653433, at *12 (S.D.N.Y. Dec. 17, 2025) (same); *Solano*, 2026 U.S. Dist. LEXIS 24316, 2026 WL 311624, at *20-21 (same).

**CONCLUSION**

An anonymous government is no government at all. It cannot be held accountable. A masked agent freely uses force without justifying his actions, and the public cannot name him to challenge his conduct.

A regime of secret policing has no place in our society. Here, the Government's power is derived by the People, and the People must be able to identify the Government when it acts to infringe on their liberty. Masks obscure government action and deprive the public of its Fourth Amendment protections.

Therefore, Mr. David Antonia Aviles Perez prays for an Order granting his Petition for Writ of Habeas Corpus, for this Court to order his released immediately from civil immigration custody. for an Order to prohibit Respondents from re-arresting and re-detaining Petitioner absent significant change in circumstances to justify detention or subject to the determination of a neutral and detached decisionmaker. Mr. Aviles Perez prays to God and hopes that the Government may get and learn something positive, productive and beneficial to all persons that is, have been and will be affected, from his case in order to tone it down the unlawful practices of deploying masked, disguised men armed with military assault rifles driving unmarked vehicles to murder, hurt, terrorize, traumatize vulnerable immigrant families and communities and individual persons just like him. these unlawful practices are indistinguishable from the tactics Mexican Cartels, Organized Crime in real life and T.V. shows employ to terrorize their enemies and innocent alike.

Dated: 8-10-2026

Respectfully submitted;

David Antonio Aviles Perez
A# [redacted]
Otay Mesa Detention Center
P.O. Box 439049
San Diego, California 92143

**DECLARATION UNDER PENALTY OF PERJURY**

Mr. David Antonio Aviles Perez, Petitioner, is detained at Otay Mesa Detention Center, on 8-10-2026, I Placed this Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2241 and the accompanied PETITIONER'S MEMORANDUM OF LAW, POINTS AND AUTHORITIES IN SUPPORT FOR THE GRANTING OF THE WRIT OF HABEAS CORPUS.

I declare under penalty of perjury that I am the petitioner, I have read this petition or had it read to me, and the information in this petition is true and correct. I understand that a false statement of a material fact may serve as the basis for prosecution for perjury.

Date: 8-10-2026

Signature of Petitioner

David Antonio Aviles Perez
A# [redacted]
Otay Mesa Detention Center
P.O. Box 439049
San Diego, California 92143

DETAINED

# ATTACHMENT

# "A"

**David Antonio Aviles Perez**
A# [redacted]
**Otay Mesa Detention Center**
**P.O. Box 439049**
**San Diego, California 92143**

**DETAINED**

I, David Antonio Aviles Perez, Petitioner in this Writ of Habeas Corpus, declares, under penalty of perjury that the following statements in this declaration are true. So help me God.

Dated: 8-10-2026

David Antonio Aviles Perez
A# [redacted]

I David Antonio Aviles Perez, Declares, under Penalty of persury, as Follow:

I David Antonio Aviles Perez a Salvador national of 35years of age A# [redacted] I'm making this decdaration under legal oath. I entered the United States of America on the 29th of December 2013 at around 11:30am, arrived at Houston Texas, and I have lived in the United States ever since. The first 10 years I was at [redacted], property thats own by Ana Aracely Ordoñez and Williams Alexander Bonilla, thanks to them I was abet to migrate from El Salvador to the United States, they helped me since they Knew I was an orphan, they gave me a place to live for 10 years at the previous address mention. In June of 2023 I moved to [redacted], At the end of May 2023 I was arrested in Monterey County in California for fighting another Salvadorian I was incarcerated for a week then let go on bond. I was also ordered to complete 150 hours of community service which were completed at a food bank called Special Delivery Food Bank in San Diego thats been the

only conviction I have had. After completing my hours, I went infront of the judge to present my hours and my case was closed. On the 26th of March I got a motorhome that I bought for 12000 dollars. I was at a parking lot in Old Town San Diego when someone Knocked at my door I looked out and they seem like 5 city workers since they had white hard hats and orange vest, they asked to move my motorhome forward because they needed to do some work in the area I was parked, they also said I had a flat back tire, I was surprised to hear that so I open the door to go out and check the tire, at that moment when I came out I realized that I have been suronded by all 5 people at that moment they launch their selfs at me to try to grab my hands I panic and almost fainted I thought they wanted to rob or Kidnapped me, being murdered even crossed my mind since they had guns pointed at me, I heard yelling

to get on the ground. I panic and resisted I didn't Know weather to follow orders or fight for my life my heart was beating really fast because I was so scared of being assassinated or Kidnapped I fought for my life for about 10 minutes trying to get away I felt a hard hit in the back of my head it was then when I lost conscious. When I woke up I had blood all over my face I was shackle and inside a moving vehicle when we arrived to an underground parking lot they got me out of the vehicle like some type of baggage I was throw out to the floor and they started to hit me while I was handcuffed, they never identify their selfs. I didn't Know if they were cops or ICE agents ever since then I been in custody at Otay Mesa Detention Center fighting for a legal status for asylum for torture.

[signature] 8-10-2026

**David Antonio Aviles Perez**
**A#**[redacted]
**Otay Mesa Detention Center**
**P.O. Box 439049**
**San Diego, California 92143**

**DETAINED**

## PROOF OF SERVICE

On 8- 10- 2026, I, David Antonio Aviles Perez, Petitioner,

Mailed or delivered a copy of this Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2241, together with a Request for Appointment of Counsel, a Petition for a Temporary Restraining Order, Injunction Relief and Preliminary Injunction and any attached pages to:
United State District Court for the Southern District 333 West Broadwan suit 420 San Diego CA 92101

by US FIRST CLASS MAIL by depositing it at the mail room in Otay Mesa Detention Center.

(signature)

8-10-2026
(date)

David Antonio Aviles Perez M-217
A# [redacted]
Otay Mesa Detention Center
P. O. BOX 439049

X

333 West Broadwan
Suit 420 San Diego CA 92101



UNITED STATES POSTAL SERVICE® | PRIORITY® MAIL

- Expected delivery date specified for domestic use.
- Domestic shipments include $100 of insurance (restrictions apply).*
- USPS Tracking® service included for domestic and many international destinations.
- Limited international insurance.**
- When used internationally, a customs declaration form is required.

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at http://pe.usps.com.
** See International Mail Manual at http://pe.usps.com for availability and limitations of coverage.

RECEIVED
AUG 17 2026
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.
USPS.COM/PICKUP

UNITED STATES POSTAL SERVICE®
ED
USPS TRACKING #
9114 9014 9645 0000 4577 13
Label 400 Jan 2013
7690-16-000-7948

4F October 2023
12 1/2 x 9 1/2

PAPER POUCH
how2recycle.info

UNITED STATES POSTAL SERVICE® | PRIORITY® ★ MAIL ★
VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:
David Antonio Aviles Parez
A # [redacted]
Otay Mesa Detention center
P.O. Box 439049

TO:
333 West Broadwan
Suit 420 San Diego CA 92101
United State
District court For the
Southern District

Label 228-C, APRIL 2016
FOR DOMESTIC AND INTERNATIONAL USE

This package is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; October 2023; All rights reserved.

UNITED STATES POSTAL SERVICE®

PRIORITY®
MAIL

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

TRACKED ■ INSURED

PS00001000014

EP14F October 2023
OD: 12 1/2 x 9 1/2

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.